Peter Ehrlichman, Dorsey & Whitney representing U.S. Bank and with me is my colleague Sean Larson Bright. I'd like to reserve seven minutes for rebuttal if I might. I do wish to apologize to the court for not being here in order to allow reordering of the argument so I hope counsel won't be disturbed at all in that respect. This is the second appeal of this case. During the first appeal this court reversed and remanded holding that the district court had misapplied the appropriate legal standards for materiality and reliance and on remand the district court reached the same conclusion based upon the same flawed reasoning as before. This case raises important questions concerning the State Securities Act and how federal courts will interpret state laws and I wish to urge that this court focus on the second sale because the second sale helps peel away all of the arguments that we're hearing from Stern AG and all of the defenses that they put forth. Now the judge held there wasn't a second sale does that matter? The judge held that there was not a second sale. Yes in his conclusion of law 23 he found that there was no second sale. Is that a legal conclusion? Is it reviewable for clear error or what? That conclusion would be reviewable under de novo. It is a conclusion of law. He did not make any findings of fact with respect to the second sale. He did not consider as a matter of findings whether or not a new investment decision had been made which of course is the test for whether or not a sale of securities has occurred and of course we know from undisputed testimony that the second sale, the amendment of the trust and deposit agreement, changed substantially the terms of the original investment. I know you'd like to concentrate on that but it seems to me you ought to. The more important point is that you, U.S. Bank, failed in your duties. How did you let the collateral escape to Geneva? You of course are referring to a portion of an argument that Stern AG made that the cause of the loss was something that U.S. Bank had done rather than focusing. Well of course we contend that that whole issue of what the loss causation was is not pertinent to an examination of the state securities laws because of the go to net decision that our state Supreme Court decided just a couple years ago where they expressly held that loss causation is absolutely not pertinent. And so U.S. Bank elected not to put on any testimony with respect to what actually occurred or what caused the loss and if you look at the record you'll not see us putting on witness after witness demonstrating that they fully complied with the trust and deposit agreement or the TDA as we put it. So we really don't have a clear record or a complete record as to what caused the money to disappear in Switzerland but what we do know is if we look at the initial transaction which is what go to net and Heinz and all these the progeny of state Supreme Court decisions say if we look at the original transaction or the second transaction. Let's look at the second one. Thank you. The second transaction which occurred in September of 2002 was a decision to either have the monies return to Mr. Goetz and his investors or to make a new investment decision to re-up and it is indeed a new investment decision. He had to go to back to the finance committees of those two entities. This is ER 393 and obtain their express agreement to proceed in September of 2002 and then Sternage brought to him Mr. Goetz a waiver and consent document which at ER 395 and 397 he executed. So this is very much a new investment decision and we know under Roberts versus Pete Marwick that this kind of conditional decision constitutes a new decision, a new investment decision and therefore a new sale. What is the Washington case that holds this irrelevant? What caused the loss? I'm sorry I didn't understand. What is the case that you then rely on that says it doesn't make any difference that the loss was caused by you? Oh I'm sorry, go to net. What does that hold? Go to net held that equitable defenses are not permissible or not relevant to an inquiry and loss causation is not relevant to the inquiry of whether or not the state securities act has been violated. It's violated, sure, I would agree with you it's violated but we're not addressing that question. The question is what produces, I mean how can you recover unless you show that you didn't cause the loss? Well that crystallizes the difference between the federal securities laws which the trial court was very used to applying and the Washington state securities act which is a very different approach. Instead of preserving markets which is the federal scheme, the state's scheme intends to protect investors. So the legislature and the state supreme court as a matter of policy have determined that loss causation is not relevant and we will not allow any equitable defenses to come in to argue away the violation. And what we have here is Stern Agee having committed the violation by failing to disclose material issues of fact. That's the question not the answer right? Sorry? That's our question not the answer. The judge said not. He said that they did not fail to disclose material facts. Right. Well as to the first sale he focused on the first sale. He never grappled with the second sale because he dismissed it out of hand as not being a sale but we know under the authority that we've cited in our briefing that in fact there was a second sale. It's not entirely clear why the second sale question makes all the difference in the sense that even if you looked at the first sale if there wasn't a second sale then there was the possibility of that amendment and you'd still be in the same place. So I don't know why the, in other words you'd have to look at the first sale in terms of what could eventually and the materiality would have to take that into account. So I don't know why the determination of whether there was a second sale is really the key to much of anything. You're absolutely right that the same analysis that we apply goes in our favor both as to the first sale and the second sale. The reason I thought it was useful to focus on the second sale because then you peel away all of the arguments about the disclaimers that were in the confidential private placement memorandum. It's just an amendment to the first one. So it's whatever remains of the first one remains. That's not necessarily true and there's no evidence in the record that supports that. It's called an amendment. It says amendment. But it's an amendment of the TDA, of the Trust and Deposit Agreement. They're relying upon a completely different document, the confidential private offering memorandum, the CPOM as we call it. And the CPOM was in no way incorporated by reference in September of 2002. There's nothing in the record that indicates that Mr. Goetz was told all of the terms and conditions of the CPOM are applicable here. And in fact, it wouldn't have made any sense for the CPOM to be applicable because whereas that agreement or that arrangement involved a letter of credit, a federal home loan bank board guaranteeing and lots of structure, none of that was present in connection with the second sale. The second sale involved a much broadly expanded definition of permitted investments that now allowed Mr. Buck Olson to invest in BAA3. The bulk of the second deal, at least in writing, was something called a withdrawal credit facility or something. What was that? The withdrawal credit facility didn't apply in this instance because that only applied if monies went outside of the and were withdrawn by Buck Olson. Well, they were. That's exactly what happened. What we see in terms of the amendment to the TDA that's operative here is an account was set up, not a credit facility, but an account was set up. The withdrawal credit facility was never established. That's what I'm trying to understand. Was the withdrawal credit facility supposed to be set up if Buck Olson took money out of the account? Because Buck Olson did take money out of the account. The withdrawal credit facility was only to be set up under certain circumstances specified in the amendment and none of those were triggered and there's no evidence in the record that anybody contends that the withdrawal credit facility should have been established. So therefore, but there was some attempt to have some backup to the money in the account. I was just saying this because you said that the second version only had money in an account, but that's not exactly true. No, if I said that, I misspoke. What I meant to say was with respect to the second sale, what happened was that the definition of permitted investments was broadly expanded to include now investments with a BAA3 rating, things that allowed Mr. Buck Olson, the crook, to invest in risky and illiquid investments. There's nothing in the amended TDA that would bar him from putting the money or directing U.S. Bank to put the money into an account of illiquid, single, risky investment with a BAA3 rating. But he didn't have the authority to take it to Geneva, did he? He could direct U.S. Bank to deposit it in any permitted investment and that's what U.S. Bank did. Well, as I understood the facts, it seemed to me that U.S. Bank clearly violated its duty as a trustee and you call that an equitable defense. It seems to me it's a tort. They are a tort, FISA, jointly with the other people and inflicting harm on the investors. When I first started representing corporate trustees, I thought that the word trustee meant something equivalent to a trustee that we're used to seeing in normal... Yes. But actually, the Shamrock Bank case instructed me, and we've cited that to you in our briefing, that a corporate trustee, an indentured trustee, has very, very narrowly prescribed duties. This is a Washington State law? No, it's actually pretty universally adopted now throughout the United States that corporate trustees' duties are limited to the contract. And the concept of fiduciary duties just doesn't apply to a corporate trustee. You have to look to the agreement, narrowly prescribed duties. And one of the duties that U.S. Bank had was to follow the instructions of Buck Olson. And that's why Buck Olson's character in his history was so critical, particularly in the second sale, when there weren't letters of credit. Because now he was entitled to direct U.S. Bank to put the money into investments that are quite, quite risky and quite different than what had been originally contemplated. My argument is that although the CPLM says several different times, we're not going to tell you anything about Buck Olson, and it doesn't matter about Buck Olson, but if you want to know about Buck Olson, go find out for yourself. We're not making any representations about him. Is your argument that they couldn't do that, or that it doesn't apply to the second sale? My argument is that under the Washington State Securities Act, you cannot discard or dispose of your obligation to present, as a seller, all material facts by agreement. In effect, what they are arguing is that that CPLM waived any responsibilities or eliminated any duty that they had to tell the truth and to tell it fully and completely about Buck Olson and anything else that would alter the total mix of information. Now, you would want to reserve seven minutes.  Okay. 2120.430.5, specific statutory provision that says agreements like the CPLM that attempt to vitiate the protections of this investor-friendly statute are void, 2120.430.5. So, any attempt by them in connection with the first transaction to say that they had shifted the duties over to Mr. Goetz to do the investigation and to find out what the truth was is void as a matter of law. And, of course, we don't have that. We don't even have those disclaimers with respect to the second sale. This case turns on whether or not Buck Olson's history was important to an investor or whether the question of legality- Are you walking away from your argument about the legal problems with-I hope you are because it wasn't a very good argument-but in terms of the legal-that there was another problem, which was that there were some legal defects in the articles of incorporation. We're focused on two omissions. One is the history of Buck Olson. And the second is whether or not there was-the issuance of the stock was legal. But isn't there a Washington statute that specifically says that a buyer in good faith is enforceable anyway? The UCC-not the UCC-provision that you're speaking about focuses on enforceability. But we're here talking about something completely different than- Well, if it's enforceable, why wouldn't somebody buy it if it doesn't matter? What's important under the State Securities Act, of course, is whether or not a material fact was omitted. And if it's not going to affect somebody's ability to trade or otherwise deal with the stock, why would they care? The investors care whether or not a matter is going to have to be litigated to demonstrate that it's enforceable and that they can get their money back. Mr. Goetz testified that he has hundreds or dozens of deals that he could select from. And he just assumed not invest in a deal where there's a question about whether he's going to have to enforce the TDA. What's the question? It says right here, a security other than the one issued by a government, even though issued with a defect owing to its validity, is valid on the hands of a purchaser for a value. That's what it says. I understand that. And that goes to the question of whether or not the TDA would be- Valid. They're saying it is valid. So what's the problem? No, what I'm suggesting is that you're focusing on, in effect, loss causation issues again. You're trying to determine whether there would be a loss- No, I'm trying to determine why anybody would care in making an investment decision about a defect that isn't going to matter to them. It matters to investors, reasonable investors, whether or not they're getting into an investment that has issues or problems. And they have so many other places to put their money that they are entitled to know, under our state act, whether or not there is a question or an issue. All right. I think you really- Thanks so much. If you really want to talk, I'm sure there's your time. Thank you. May it please the Court. Mike Redeker for Stern, Agee, and Leach. I'd like to address the question of the withdrawal credit facility because the scheme that everybody understood, the structure on the second amendment, or the amendment, September was very simple. Section 3.7 at ER 382 says the company shall not withdraw funds from the initial deposit account. The reason for that was, as you know, in the original offering, the $15 million transferred to Humboldt Bank at closing and was replaced in the hands of U.S. Bank with a letter of credit backed up by the FHLB. When they changed the structure, the $15 million came back from Humboldt Bank, in effect, and it's now supposed to reside in U.S. Bank's vaults. U.S. Bank went on that credit. It's a little strange to me. They had already been doing business with Olson for a year. It's very strange that undertaking to be now liable on a $15 million deal, not just trustee, but also backing it, that they wouldn't have checked out Mr. Olson themselves. But in any event, Mr. Olson did not tell them on December 24th in his letter to surrender position. In fact, to the contrary, the last sentence of his letter directed the bank that it had the right to continue to use this to back up any redemption or tender request. But the withdrawal credit facility, the whole idea was, if you read that at the bottom of the page, 3.7a says, before you take the money and put it in the hands of Olson or Eric. And that's what basically happened. It went into an Eric account. U.S. Bank that day could have, theoretically, called the bank in Switzerland and said, we're wiring in money. We would like a delivery versus payment. Please, given the holidays, set up an account for U.S. Bank at your bank and make sure you put it in that account. They didn't do that. In fact, as we know, it was a month or two before it finally, this Turkish guy, Shefket, finally put some of that into an Eric account. Now, whose directions were they following when they did that? They were following Mr. Leslie, Frank Leslie's directions, not Buck Olson. Buck Olson, never. There is no testimony and no documents saying to do that. Who is the one they, what's his function? Frank Leslie was the trust administrator of this trust. At U.S. Bank? At U.S. Bank. The one who was like a sack. Whose direction was he following? He was following a letter which basically said, did not contravene the TDA as amended, which said, okay, here's a permitted investment. And go ahead and put this in a permitted investment. We'll leave aside whether he checked out whether, to be permitted, it had to have two things. If you're going to put it in the society general bond, which they put it in. Number one, you would have had to check that that was a, that did meet one of the tests of permitted investment. But you also had to check the Moody's rating on it. And that had to be investment grade. But even that isn't the problem. When they took the $15 million, they put it in a zero coupon bond, which only cost about $12.5 million. So ab initio, instantly, $2.5 million went unaccounted for, went missing. We don't know. That just skimmed off the top. Never accounted for. And somebody, nobody seemed to have paid attention to that at the bank. Then you have the zero coupon bond, which is not suitable for, remember, these are 90-day tenders. All right. But that's, you couldn't. All of this is somewhat peripheral to the issues in the case. Is that not fair? All of this is, I'm sorry. Somewhat peripheral to the issues in the case. All right. In that, I suppose it's perhaps relevant to the indemnity issue, if you want to talk about that. Because you're essentially saying that the U.S. bank was a tort fee, or so, therefore. But it hasn't really been established as such. Nobody's ever litigated that. Yes, it has been. The court, I believe, found that this was a seeking indemnity. The bank never contested that it had violated. It received a letter charging it with having breached the trust. And what it did was it bought the claim against itself. Now, going back to this issue of loss causation, which relates to, I think, your inquiry, Judge Berzon, this is not an issue so much of loss causation, but as, during the trial, Judge Layton himself said in response to an objection by Mr. Ehrlichman, this really goes to the issue of what is material. What is material is everybody's focused on, we're giving up a letter of credit that's backed by the Federal Home Loan Bank in San Francisco. And instead, we're now going to get something that is backed up by another bank. But it is not a Federal Home Loan Bank. It is U.S. bank. And U.S. bank has a slightly lower rating at Moody's at that time than the combination LOC for the principal. Well, that goes to the whole issue of materiality of what do you expect when you're buying a collateral. What you expect is I'm putting it with a huge old bank. And you're putting it now in a situation, as I understand it, in which Mr. Olson now has some direct role in whether the security is secure because he's going to make investment decisions. So at least that much more role for Mr. Olson. That's incorrect, Your Honor. Why is it incorrect? Because Section 4.6 and Section 4.7 in the definition of account manager didn't change. He had that role ab initio on May 21 of the time. But he now has a considerably, a considerably broader range within which he can make account decisions or investment decisions. Just a minute. Oh, I'm sorry. Okay. He can make investment decisions. And also, the security is at least to some degree less secure. So for those two reasons, you might have a difference in how much you cared about Mr. Olson. I mean, that's really where this is all heading, right? I mean, this is all heading to the question of whether there was more interest in the more legitimate interest and therefore more likely materiality in Mr. Olson's background at the time of the amendment. Whether you call it a second scale or not, I'd like to hear what you say about that, than there was before. Okay. Two points. The risk in going from a permitted investment that is a U.S. Treasury to a permitted investment that is, say, a bank-guaranteed obligation that meets a Moody's investment-grade rating, that was a risk that was fully disclosed, accepted, and known. It was reflected in the discussions. At the time of the amendment. And that is not dependent on who Olson is. Oh, are you talking about the time of the amendment? The amendment? Okay. The amendment. Before the amendment, you have a more like a legal investment list. After the amendment, it was a little broader and you could invest, for instance, in something like a New York branch guarantee issued by the New York branch of a foreign bank. Associated General was a $471 billion bank, so it wasn't exactly a fly-by-night. But the point being, that risk is not dependent on who Olson is. Why? That risk is dependent on the choice made at the time they agreed to the substitution of collateral and the amendment to the TTA. They bargained for a wide range. What they didn't bargain for was for U.S. Bank to advocate any duty to check whether that particular investment was, in fact, meeting the criteria. If it had met the criteria and they had kept permission, it doesn't make any, kept possession, it's irrelevant who Olson is. If Olson, for instance, had said, put it in a United States money market run by, well, I said Wells Fargo. I wasn't going to say U.S. Bank, but by Wells Fargo, that would have met the credit. We wouldn't have had this problem. Ultimately, at least one range of issues here. It seems to me there are two major, at least in my mind, two major roads to go down. One is the whole materiality reliance set of issues, and the other is whether this is really an indemnity, which nobody has addressed yet, but I'd like to hear it. But starting with the materiality reliance set of issues, the way this all hooks up is the judge made a finding, he says on the record, that there was no materiality based in part on what Mr. Gitch said, although it's supposed to be a reasonable person rather than any particular person. Now, is that, am I wrong about, you're looking at somebody as if I am. It was not nearly that limited. If you read through the judge's findings of fact, you will find he did a great deal of study on that issue, and maybe it's the argument the 50 million Frenchmen can't be wrong, but basically what he said was it wasn't just this person. How do you measure a reasonable person? And by the way, it's in light of the circumstances under which the investment is made. That's the statutory language. That's also the language of the U.S. Supreme Court in the TSC case. So with that as a backdrop, he looked at this. He looked at the purposes of the VRDN and the credit and the usages of the marketplace and made findings on that. He looked at the fact that all the law firms, including in the 10 times larger deal, the $110 million deal, the Womble firm, the Balsham-Bingham firm, Sol Reeves firm, all of these attorneys made a materiality determination about what needed to be in the CPLM. If I may make some insensical and non-expert and non-reaction to that all is, well, I understand why the security is what mattered as to whether they were going to lose their investment, but I don't understand why they wouldn't be interested in the background of Mr. Olson with regard to whether they were going to make any money on their investment. It's not a money-making investment. It's an interest-paying investment. I meant that. Give me some credit for knowing what I'm talking about. I apologize. I actually do know what happened here. But still, so therefore, they want their interest. And if, in fact, Mr. Buck Olson has no idea what he's doing and before or after or close to the time of the first interest payment or the third interest payment, the whole thing is going to tank. Would anybody bother with this? They got their money back. Let's assume they thought they were going to get their money back. But are they going to bother doing this if the whole thing is just going to tank? They had the ever-present possibility every 90 days to tender. They had the ever-present possibility that this would be called. I understand that, but why isn't it material in making the decision whether to invest, whether they're going to have to do that because the whole thing is going to tank or whether this is a long-term investment that they'll make some continuing amount of money on? There is substantial evidence, which I brought out in a cross-examination, which we're barely reading, that the time horizon was not longer than really two years. The maturity was five years. So they want to know at least whether he's likely to make two years worth of it. They held this paper for 18 months, almost two years. It is not unusual in the VRDN market for people to go in and out. One of the reasons why that shows it's not material, the primary reason why they would tender and get out at the end of 90 days has nothing to do with Mr. Olson. It's simply that the interest market has changed and they can get a better rate on another deal. They do that all the time. They would exercise CERN AGU, would try to remarket in the light of the new market and try and get a better rate. Meanwhile, the investors are being solicited daily by other people, purveyors of higher rate yields with the same Moody's rating. What I'm trying to say, Your Honor, is absolutely there is nothing in the record that this was going to be a long-term investment. The very structure of it mandates that they have the flexibility. They desire to have the flexibility. They were a money market fund. They did not want a long horizon. Think about the kind of fund they were. Let's turn to the other issue. You heard the argument that under Washington state law, the misbehavior of the trustee didn't make any difference. The misbehavior of the trustee does make a difference, Judge Noonan, because the policy of both the state and federal laws, but especially the Washington law where there's a great deal of law about indemnity versus contribution. The policy is you don't do something wrong and then go by the claim and use this statute. You're not even an investor. Use an investor statute to indemnify yourself. It's sort of a gimmick. It's an end run. And in our brief, we cited the end run. There is a Washington case that thoroughly disapproves of doing end runs to obtain indemnity. This is not new ground. And Washington, by statute, outside of the Washington Securities Act, WSSA, as well as under WSSA, says you can only get contribution. You cannot indemnify yourself. As I understood, Mr. Ehrlichman, he said, well, the trustee didn't do anything wrong. As a corporate trustee, it followed instructions. The court had plenty of evidence before it that this man had, if you look at the judge had before him, and it's in evidence, the letter from Olson on the 24th, which specifically said this is what you do. They didn't even follow Mr. Olson's letter. Then they had in evidence the January 1703 receipt, which does not even show that yet that Ehrlichman has possession of it. Finally, on February 17th, which is roughly 60 days later, Shefkatz says, okay, you've got a $12.5 million piece of security over here. And Leslie gets these things, and he looks at them, and he doesn't do anything about it. Not just that year. He doesn't do anything for another 16 months. And finally, in the summer of 04, it comes to a head. He's been fired by the bank, hasn't he? I'm sorry? He's been fired, hasn't he? He was fired, and his supervisor was basically fired, too. And the stated reason... Was there some suspicion they were collaborating? Nobody's ever been able to figure that out. There's my suspicion, yes, they were collaborating. Because it's very strange, the behavior of... The behavior is unaccountable. The only benign explanation is that it was Christmas Eve, and he was looking forward to an eggnog party. He left early, and he negligently just sent a direction, an internal email to his wire department, with very little instruction, very little guidance, and just said, wire this money, and here's the account to wire it into, and he didn't tell them anything else. And he should have done that, and that's negligent. It's very strange. When he comes back from Christmas, between Christmas and New Year's, why didn't he follow up? All of these questions are just looming, at any rate. All right, but in terms of our question right now, which is whether there is... Under Washington law, it seems rather adventuresome for us as a Federal Circuit to recharacterize this entire transaction, where they claim that they're just standing in the shoes of investors, and we would have to say, no, that's really not what you're doing. You have your trustee hat back on, and you are simply going after a joint tortfeasor, essentially, with regard to an indemnity. And I guess I have another question, too, which is, how do we know that this is a disguised indemnity action, as opposed to a disguised contribution action? If it were a disguised contribution action, it would be all right, right? A disguised contribution action wouldn't be disguised. It would be a claim for contribution. Everybody would have... There would have been evidence. And for instance, in contribution, you have to figure out how many people... You don't take into account just the contributor's choice of the number of defendants. You look at the number of potentially liable people, and that's how you slice up the pie. That was never done here, and we never had an opportunity to do it, and they didn't even try to do it. No, this can only be an indemnity action. And it's a mixed question of fact and law, I would submit, not a pure question of law, and I think deference has to be given under the standards to Judge Leighton's finding about this. He heard and watched Strodoff testify about his... Strodoff is the mastermind of this, from the Minneapolis headquarters. And he testified. They didn't call him. The court required him, at my request, to come to trial. And he watched that man testify, and that man basically admitted they were seeking to get their money back. He did it very grudgingly, but if you will read that part of the transcript, I believe Judge Leighton had plenty of ground to find it was... Another technical question about the transcript. Mr. Goetz testified at trial that he did care about Mr. Olson, and he did care about the legality issues, right? And he had testified otherwise in his deposition. Now, at trial, did the deposition come in as a prior consistent statement or what? It did, at page 83. And in addition, at the end of the second day, starting at page... I'll give this to you. Starting at page 288 of docket number 493, I would commend that to the court's different questions. Again, at the 2009 trial, that he had answered in the 2005 trial, and he said he meant what he said in 2005. And Judge... Not what he said at the deposition, which was the opposite. I'm sorry? But not what he said at the deposition where he pretty much said the opposite. No, what he said in the deposition was what we claimed assists our case. I'm sorry, I'm sorry, you're right. What he said at the trial. What he said on direct. You read his direct, and you read the cross, and you say, are these two different people testifying? That's what credibility determination is about. And Judge Layton watched this man very closely. Okay, another technical question, and then I'm afraid you're probably going to have to sit down. The case was reversed in part because the presumption of reliance was not applied and I don't really see Judge Layton applying the presumption of reliability very consciously here either. Well, because if you read my closing argument, which unfortunately we did not put in the SER, you will see that at length, with a PowerPoint, I explained that this really was a misrepresentation case, not an omission case, and Judge Layton got into this whole interesting thing about a disclosed nondisclosure, which I say also makes it a misrepresentation case, not an omission case. But where in the findings of fact and conclusions of law would you say that we could look to see that Judge Layton actually applied the presumption? If he was supposed to, or decide that he didn't have to, one or the other? He was directed to, so I think we have a law of the case problem on that anyway. But leaving that aside, where does he address it at all, in either direction? He addressed it on, he didn't directly hold one way or the other, but on the finding of fact with regard to the WBCA, we, there are, I'm sorry, I'd have to submit that to you if I could in a subsequent letter. I'm a little flustered right now, and I have so many annotations here, and there are 386 findings of fact, what I would say to you is, if I may with the court, there are two points. One, Stone Ridge, U.S. Supreme Court, affiliated U.S. Supreme Court, the duty to speak, which created the presumption of reliance, they're tied together, was where the actor, the defendant, knew the facts and did not disclose them, and also knew he had a position of superior knowledge to the other. That would be the case with the white man and the mixed bloods in the Ute case. That did not happen here. If you were to hold, arguendo, that Stern Agee was liable here, I respectfully submit this would be the first and only case in the federal reporter that held somebody who did not know the facts and who had their, everybody accepted that they had no duty to investigate the background, nevertheless, was liable. But we have a prior opinion. The prior opinion. Assumed, I respectfully say Judge McCune, assumed for the purposes of their opinion that it was an omissions case. I pointed out in the second trial, it was not an omissions case. And if you go through the findings of fact, and again, I beg the court, if the will have you the list of the paragraph. Okay, thank you very much. Thank you for your argument. Sir. Mr. Ritiker says that this would be the first time in the federal system, but it certainly wouldn't be the first time in the state of Washington. The Hines case held, notwithstanding reliance upon lawyers' opinions, that where somebody knew or in the exercise of reasonable care should have known of a that they had a duty to disclose it, somebody secondarily liable like Stern Agee. And of course, the court here found not only were they secondarily liable, that is to say a broker dealer that was aiding and abetting, but they were also a seller. Yeah, but one only gets to the reliance question if you get past the materiality point, right? If you get past the... Materiality point. I see your point. And we cannot conceive of a case where Olson's history would not be more pertinent. But Mr. Goetz said that it absolutely wasn't and the judge chose to believe him, and why can't he do that? Mr. Goetz actually on cross-examination testified at... I understand that. But the judge chose to believe one version of what he said rather than the other version of what he said. Now, I suppose you will then go on to say, but Mr. Goetz's... As to the materiality as opposed to reliance, Mr. Goetz's views are not controlling. That's true, but this court has already determined that reasonable investor is the standard. But I invite you to compare the cross-examination, which they say is in contrast with the direct examination of Mr. Goetz, and you will find that in fact they're not in contrast. They are not diametrically opposed because in his cross-examination at ER 909, he said in response to a question Mr. Ritiker posed him, well, again, sir, given all of the situations that Buck Olson found himself in, and his lack of business expertise and so forth, I've got so many options to choose, different investment options, and I don't want to buy issues that could create potential problems for me down the road. And that would have been something that would have been a red flag for me. And on the next page, he says, given Mr. Olson's background, you know, it's something that I would like... I would have liked to know, especially given his inability to conduct business in a proper manner and run a company. Mr. Erwin, you haven't got much time. We've got a minute left. Would you comment on the opposing counsel's statement of the acts of negligence that created this problem? Thank you. The whole so-called indemnity defense that they created, there is no such defense under Washington State law, under Gautinet and Hines. There are no equitable defenses like that. But it's important that you realize that... Just a minute. Why is it an equitable defense? First of all, why is it a defense at all, as opposed to simply a characterization of the lawsuit? And second of all, if it is a defense, why isn't it a statutory defense and therefore not an equitable defense? U.S. Bank was not a joint tortfeasor, was not a tortfeasor, was not... Well, that's a different point, but you're leaving aside this notion that it couldn't exist. I mean, so now you're saying, well, it could exist, but it doesn't apply to them. Well, I think you have to carefully view U.S. Bank in the light in which they sat in this case. They were the investor. They were not here as a trustee. They were not being sued as a trustee. But they only got the rights of the investor essentially as a settlement of an otherwise unatorium. For a song. I mean, it's just a pretense. I mean, it was a gimmick. Maybe it worked, but maybe it isn't going to work. This court cannot cast aside the power of the assignment, because if you do that, you then vitiate the ability of people who are misled into pursuing those claims, either directly or by virtue of assignment. The Washington courts have allowed assignments of these claims, and U.S. Bank... But the question is, in what capacity are they holding it? You say they're holding it qua investor, but they only actually got it qua investor. The only reason they were in a position to acquire the shares is essentially because of this other problem, and one of the things they got in exchange for the money was that the investors weren't going to go after them for the tort or the fiduciary duty problem. If ABC Corp had been loaned money by U.S. Bank or had somehow acquired enough funds to investors and had brought this suit against Stern Agee, we wouldn't be facing the questions of whether or not U.S. Bank was a tort feature. Probably wouldn't have gotten a waiver of a lawsuit as part of the deal, but here's what you have. Stern Agee can sue anybody it wants to for contribution when it is held appropriately responsible for this transaction. We wouldn't be here if they had disclosed at the outset the background of Mr. Olson. We would not have had the show money transaction that this thing really was all about. We wouldn't have ever been in the... So if in fact they are held liable, then they can turn around and sue you? They can sue anybody they want for contribution, but of course, Washington State limits claims for contribution against other WSSA violators, so they would have to first show that U.S. Bank had violated the Washington State Securities Act, and that's a claim that hasn't been brought, and there's no basis in the record for showing that U.S. Bank was a WSSA violator. The statute limits indemnity claims to, or contribution claims to, those who are liable under WSSA, and we don't have that allegation here. It is very important that we focus on U.S. Bank as investor, not U.S. Bank as trustee. They would like very much, and they've succeeded at the trial court level, of confusing those two roles, and really we've then gone down the slippery slope of thinking about what caused the loss, and did this plaintiff cause the loss, but that is not crisp thinking under the state act, and we urge this court to help the district court see that again, it did not engage in crisp thinking, but instead was very result-oriented, was trying to achieve his own independent sense of fairness, rather than strictly applying this state statute, which is subject to de novo review by you, and seeing that the violation occurred at the time of the initial transaction, and again, at the time of the second sale, when they failed to tell Mr. Getz something that he very much wanted to know, and he's told you that in his deposition. The judge found otherwise, I mean, that's the weakest argument you've got, is the judge found otherwise. But the judge did it not based upon credibility or demeanor, he did it based upon the so-called conflict between the testimony. That's right. So I invite you to go and look at the deposition testimony, where Getz says it would have made him think twice, his direct exam, where he says, I absolutely wouldn't have done the deal if I'd known about the Olson history, and his cross examination, which I just read to you, where he reiterated the fact that he would not want to do a deal with this guy had he known about it. And that tells you. To wrap up. Okay. Well, that tells you a ton about what Mr. Getz thought was important in terms of reliance, but you can take more than just Mr. Getz's testimony, look at Mr. Sullivan's testimony. We really need to wrap up. Thank you very much. Thank you for your attention. I appreciate it so much. Thank you very much, both counsel.
judges: Noonan, Thompson, Berzon